# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SECURITIES AND EXCHANGE                    CASE NO. 8:20-CV-325-T-35AEP
COMMISSION,

      Plaintiff,

v.

BRIAN DAVISON;
BARRY M. RYBICKI;
EQUIALT LLC;
EQUIALT FUND, LLC;
EQUIALT FUND II, LLC;
EQUIALT FUND III, LLC;
EA SIP, LLC;

      Defendants, and

128 E. DAVIS BLVD, LLC;
310 78TH AVE, LLC;
551 3D AVE S, LLC;
604 WEST AZEELE, LLC;
2101 W. CYPRESS, LLC;
2112 W. KENNEDY BLVD, LLC;
5123 E. BROADWAY AVE, LLC;
BLUE WATERS TI, LLC;
BNAZ, LLC;
BR SUPPORT SERVICES, LLC;
BUNGALOWS TI, LLC;
CAPRI HAVEN, LLC;
EA NY, LLC;
EQUIALT 519 3RD AVE S., LLC;
MCDONALD REVOCABLE LIVING TRUST;
SILVER SANDS TI, LLC;
TB OLDEST HOUSE EST. 1842, LLC;

      Relief Defendants.

_____/

## <u>THE RECEIVER'S FIRST QUARTERLY STATUS REPORT</u>

Receivership Information and Activity from February 14, 2020 through March 31, 2020

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

I.      **Procedure and Chronology** .......................................................................... 2

II.     **The Receivership Process** ............................................................................ 4

PRELIMINARY FINDINGS ..................................................................................................... 7

III.    **Overview of Preliminary Findings** ............................................................. 7

       A.     **The Scheme** ............................................................................. 8

       B.     **Sales of Investments** ............................................................. 12

       C.     **Funds** ..................................................................................... 14

                 1.     EquiAlt Fund (Fund I). ................................................. 14
                 2.     EquiAlt Fund II. ............................................................ 15
                 3.     EquiAlt Fund III. .......................................................... 15
                 4.     EA SIP Fund .................................................................. 16
                 5.     New Funds ..................................................................... 17

       D.     **Real Estate Operations** ....................................................... 18

       E.     **Interest Obligations to Investors** ....................................... 19

       F.     **Creation of the QOZ and the REIT 20** ............................... 20

       G.     **Comingling of Monies between EquiAlt LLC and t he Various EquiAlt Funds** ..................................................................... 22

                 1.     Transfers Between Accounts .......................................... 22
                 2.     Transfer of Properties Between Receivership Funds ........... 24
                 3.     Fees Paid to EquiAlt by the Receivership Funds .............. 24

       H.     **The Receivership Funds and EquiAlt are Insolvent** .......... 27

| | | | |
|---|---|---|---|
| | 1. | Fund I | 27 |
| | 2. | Fund II | 27 |
| | 3. | EA SIP | 28 |
| **I.** | **Use of Receivership Funds and Assets by Rybicki and Davison** | | 29 |
| | 1. | Barry Rybicki | 29 |
| | 2. | Brian Davison | 30 |
| **IV.** | **Opinions of the Receiver** | | 34 |
| **ACTIONS TAKEN BY THE RECEIVER** | | | 35 |
| **V.** | **Securing The Receivership Estate** | | 35 |
| | **A.** | **Fund Accounting** | 35 |
| | **B.** | **Freezing Bank Accounts and Liquid Assets** | 36 |
| | | 1. Accounts at Bank of America, N.A. | 37 |
| | | 2. Accounts at Wells Fargo Bank, N.A. | 38 |
| | | 3. Accounts at JPMorgan Chase, N.A. | 39 |
| | | 4. Accounts at Comerica Bank, N.A. | 40 |
| | | 5. Investments and Investment Accounts | 40 |
| | **C.** | **Securing Real Property** | 41 |
| | | 1. 2112 W. Kennedy Boulevard, Tampa, Florida | 42 |
| | | 2. 21 W. 20th Street, Unit 5, New York, New York (NY Condo) | 42 |
| | | 3. 2101 W. Cypress Street, Tampa, Florida | 42 |
| | | 4. Phoenix, Arizona Operations | 43 |
| | **D.** | **Investigation of Other Real Property** | 45 |
| | **E.** | **Securing Properties** | 45 |
| | | 1. Vehicles | 46 |
| | | 2. Watches and Other Jewelry | 46 |
| | **F.** | **Securing the Receivership Entities' Books and Records** | 46 |
| | **G.** | **Operating Businesses** | 47 |
| **VI.** | **Retention of Professionals** | | 51 |

**VII.**    **Pending and Contemplated Litigation** ........................................................53

     **A.**    **Pending Litigation** ....................................................53

     **B.**    **Contemplated Litigation** ........................................53

**VIII.**  **Claims Process** ....................................................................54

**IX.**    **The Next Ninety Days**. ........................................................55

    **CONCLUSION** ....................................................................56

**INTRODUCTION**

Burton W. Wiand, the Court-appointed receiver over the assets of the above-captioned corporate defendants[1] and relief defendants (the "**Receiver**" and the "**Receivership**" or "**Receivership Estate**"), files this First Quarterly Status Report to inform the Court, investors, creditors, and others interested in this Receivership of activities to date as well as the Receiver's proposed course of action.  The Receiver has established an informational website, www.EquiAltreceivership.com, which he has updated periodically.   The Receiver will continue to update the website regarding the Receiver's most significant actions, important Court filings, and other items that might be of interest to the public.  This First Quarterly Status Report, as well as all subsequent reports, will be posted on the Receiver's website.[2]

**Overview of Significant Activities During this Reporting Period**

During the time covered by this First Quarterly Status Report, the Receiver and his professionals engaged in the following significant activities:

- Served the order appointing the Receiver and freezing the assets of the defendants and relief defendants on at least **73** individuals and entities who could have assets and/or records belonging to the Receivership Estate;

- Recovered **$4,192,415.62** from accounts at Bank of America, N.A. and transferred to Receiver-controlled accounts at ServisFirst;

- Froze, at minimum, an additional **$1,616,188.73** at numerous financial institutions plus an additional $1,066,174.18 in accounts at Bank of America that are related to the Defendants but not specifically part of the Receivership;

- Secured 3 parcels of real property in Florida, plus EquiAlt's office in Arizona;

---

[1]   The Receivership Estate does not currently include the individual defendants.

[2]   As directed by the Court, the Receiver will submit his next Quarterly Status Report and subsequent reports within thirty days after the end of each calendar quarter.

- Reached a consent agreement with the State of Michigan Department of Licensing and Regulatory Affairs regarding its existing claims against EquiAlt;

- Retained legal counsel, forensic accountants, tax accountants, a technology services firm, and an asset manager to assist the Receiver;

- Interviewed dozens of individuals, including employees, sales agents, investors, and accountants;

- Established an informational website for investors and other interested parties;

- Took control of EquiAlt's website;

- Collected thousands of pages of documents from at least **20** nonparties, including employees, banks, credit card companies, accountants, lawyers, jewelers, car companies;

- Fielded dozens of calls from investors and have registered over 500 EquiAlt investors through the Receiver's website; and

- Continued to run the day-to-day operations of the Receivership Entities including the management of over 350 real estate properties.

The above activities are discussed in more detail in the pertinent sections of this First Quarterly Status Report.

## **BACKGROUND**

### I.      **Procedure and Chronology**

On February 11, 2020, the Securities and Exchange Commission ("**SEC**") filed a complaint (Doc. 1) against (1) defendants Brian Davison ("Davison"); Barry Rybicki ("Rybicki"); EquiAlt LLC; EquiAlt Fund, LLC; EquiAlt Fund II, LLC; EquiAlt Fund III, LLC; EA SIP, LLC ("collectively "**EquiAlt defendants**") (collectively, the "**defendants**") and (2) relief defendants 128 E. Davis Blvd, LLC; 310 78th Ave, LLC; 551 3rd Ave S, LLC; 604 West Azeele, LLC; 2101 W. Cypress, LLC; 2112 W. Kennedy Blvd, LLC; 5123 E. Broadway Ave, LLC; Blue Waters TI, LLC; BNAZ, LLC; BR Support Services, LLC; Bungalows TI, LLC;

Capri Haven, LLC; EA NY, LLC; EquiAlt 519 3rd Ave S., LLC; McDonald Revocable Living Trust; Silver Sands TI, LLC; TB Oldest House Est. 1842, LLC. (collectively, the "**relief defendants**"). The foregoing corporate defendants and relief defendants are referred to as the "**Receivership Entities**."

The complaint charges the defendants with violations of the federal securities laws and regulations in connection with a real estate Ponzi scheme. The SEC alleges that from January 2010 to November 2019, EquiAlt raised more than $170 million from approximately 1100 investors to invest in three separate real estate funds. The SEC alleges that EquiAlt misrepresented the use of the proceeds of the investments and that Messrs. Davison and Rybicki, who controlled the operations of the defendants, misappropriated monies from EquiAlt to the detriment of the investors.

On February 14, 2020, the Court entered an order appointing Burton W. Wiand as temporary Receiver for the Receivership Entities (Doc. 11) (the "Order Appointing Receiver"). The Court directed him, in relevant part, to "[t]ake immediate possession of all property, assets and estates of every kind of the Corporate Defendants and Relief Defendants . . . and to administer such assets as is required in order to comply with the directions contained in this Order." *See id.* at ¶1. The Court also entered a Temporary Restraining Order (Doc. 10) imposing a temporary injunction against the defendants and relief defendants, freezing their assets, and required an accounting from Messrs. Davison and Rybicki related to monies they received from EquiAlt as well as an accounting of all assets and accounts for EquiAlt and the EquiAlt Funds.

A show cause hearing on the Preliminary Injunction Motion was scheduled for February 27, 2020. Upon the Defendants' Unopposed Motion to Postpone the Hearing and for Extension of Time to Provide Sworn Accounting, the Court rescheduled the hearing for May 13, 2020 and extended the deadline to file the sworn accountings until March 10, 2020 (Doc. 29).

Due to the COVID-19 pandemic, the Court entered an Order on March 19, 2020, continuing all hearings scheduled through May 29, 2020 and staying all deadlines in the Court's pending civil cases. The Show Cause hearing has not been rescheduled at this time.

## II.   The Receivership Process

In late January 2020, counsel for the SEC contacted Mr. Wiand to determine his willingness to serve as Receiver in this matter.  On January 30, 2020, Mr. Wiand sent the SEC a letter outlining his experience acting as a federal equity receiver and attaching biographical information about professionals he intended to retain should the SEC recommend and the Court approve his appointment.  *See* Doc. 6, Ex. 1 In the letter, the Receiver informed the SEC that the Receiver and his attorneys would discount the rates they charge clients in private commercial litigation by approximately 15-30% to conserve resources and preserve the Receivership Estate.  Based on this information, the SEC recommended that the Court appoint Mr. Wiand as Receiver, and the Court did so on February 14, 2020.  *See* Doc. 11 at p. 2.

Although the SEC recommended Mr. Wiand's appointment, the Receiver is an agent of the Court – not an agent or employee of the SEC. To ensure that the Court is informed of the Receiver's activities, the Order Appointing Receiver requires the Receiver to file this Quarterly Status Report within 30 days after the end of each calendar quarter (Doc. 11 at ¶28).

The Receivership Orders also require the Receiver to seek Court approval of most (if not all) material transactions, settlements, and agreements.  For example, the Receiver has already requested the Court's approval of his engagement of professionals to assist him in carrying out his mandate (Docs. 61 [retention of Coldwell Banker as Valuation Consultant] and 76 [retention of PDR for Receivership accounting services]).

The Order Appointing Receiver also requires the Receiver to submit his Quarterly Fee Application within 45 days of the end of each calendar quarter (Doc. 11 ¶ 33).  To ensure the activities of the Receiver and his professionals benefit the Receivership Estate or are otherwise appropriate, the Receiver first reviews all invoices and makes any necessary adjustments.  The SEC has provided the Receiver with detailed billing instructions, and the Order Appointing Receiver requires the Receiver to comply with those instructions.  Doc. 11 ¶ 36.  They also require the Receiver to submit his applications for the payments of fees and costs first to the SEC for review and then to the Court for approval.  *Id.* ¶33.  The Receiver is in regular communication with his professionals and the SEC to ensure his activities benefit the Receivership Estate or are otherwise necessary.

As described below in Section V, the Receiver has already collected some assets, and he is in the process of obtaining additional assets and funds.  In cooperation with the individual Defendants, the Receiver is also beginning the process to liquidate certain high-end vehicles.

If the Receivership continues after the Show Cause hearing, at the appropriate time, the Receiver will move the Court to establish a claims process for the distribution of funds to creditors, including defrauded investors.  As part of that process, he will seek Court approval of a proof of claim form and procedures for providing notice of the claims process to known

and potential creditors, including publication in local and perhaps national newspapers.  The Receiver will ask the Court to establish a claims bar date by which all claimants will be required to serve their proof of claim forms on the Receiver, who will then evaluate the claims.

After the Receiver completes his evaluation, he will present his determinations to the Court and ask the Court to approve them on an interim basis.  He will then serve notice of his determinations on the claimants, who will have an opportunity to object to the Receiver's determinations through specific procedures approved by the Court and consistent with due process requirements.  In the Receiver's experience, most objections can be resolved or settled using such procedures, but if any objections cannot be resolved, they will be presented to the Court for determination.  Through this process, the Receiver intends to establish groups or classes of creditors with approved claims that are entitled to receive distributions from the Receivership Estate.

Once the claims process has been completed or substantially completed, the Receiver will evaluate the amount of cash available for distribution and move the Court to approve a first interim distribution to claimants with approved claims.  If material claim objections are pending at the time the Receiver determines a distribution is appropriate, he might move the Court to establish reserves for the claims at issue so they do not impair the Receiver's ability to make a distribution to claimants with undisputed claims.  The Receiver anticipates making multiple distributions as assets become available, subject to cost/benefit concerns.

When the Receiver determines there are no more assets to collect or claims to pursue, he will move the Court to make a final distribution to claimants and to close the Receivership. He will also file a final report and accounting.  While the procedures outlined above are

generalized and are subject to change as the Receiver learns more about the defendants and Receivership Entities, the Receiver is hopeful that these procedures and safeguards will allow him to return assets to creditors, including defrauded investors, in an efficient and cost-effective manner.

## PRELIMINARY FINDINGS

### III.    Overview of Preliminary Findings

The Order Appointing Receiver authorizes, empowers, and directs the Receiver to "investigate the manner in which the affairs of the Corporate Defendants and Relief Defendants were conducted and institute such actions and legal proceedings, for the benefit and on behalf of the Corporate Defendants and Relief Defendants and their investors and other creditors as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred money or other proceeds directly or indirectly traceable from investors in EquiAlt Fund, LLC, EquiAlt Fund II, LLC, EquiAlt Fund III, LLC, and EA SIP, LLC,…." Doc. 11 ¶ 2. Following this mandate, the Receiver has and continues to obtain and review records from the Receivership Entities and third parties. The Receiver has also engaged forensic accountants (Yip Associates) who are examining the books, records and transactions of the Receivership Entities and those affiliated with them as well as other third parties.  The Receiver has interviewed and received information from various individuals who worked for the Receivership Entities or engaged in transactions with those entities. The Receiver has gathered substantial information from

investor victims. Additionally, the Receiver has relied on the Declaration of Mark Dee, Senior Accountant with the SEC (Doc. 7, Exh. 1) and the exhibits and documents attached thereto.

The Order Appointing Receiver also directs the Receiver to report to the court with respect to such matters including a recommendation as to the continuation of the Receivership. The Receiver has formed preliminary conclusions based on these activities. While the investigation is not complete and this report will likely be amended and augmented in the future, the Receiver believes that the matters reported below are supported by the evidence reviewed to date and warrant being shared with the Court, the investors and other potentially interested parties. Below are the Receiver's preliminary findings and recommendations.

### A. <u>The Scheme</u>

There is abundant evidence that supports the allegations that the Defendants were operating a fraudulent investment scheme. The scheme began as early as 2010 and was focused on raising money from individual public investors for purported real estate investment activities. Davison and Rybicki caused EquiAlt LLC to be formed in Nevada and began to raise monies through a series of "Funds". Davison, who had moved to Tampa after filing personal bankruptcy in Nevada, controlled the real estate activities and much of the administrative activities of the scheme. Rybicki's activities were in large part directed towards raising money from investor victims. Rybicki's entry into this venture also followed a failed business career in mortgage banking that led to his personal bankruptcy.

The Funds that are currently part of the Receivership are the EquiAlt Fund (Fund I), EquiAlt Fund II, EquiAlt Fund III and the EA SIP, LLC ("Receivership Funds"). The first of these funds began raising money in 2011. All of these Receivership Funds are very similar in

structure and purpose and the misrepresentations made to raise money from investors permeate these funds.  In addition to these four funds, Davison and Rybicki caused two other funds to be formed – Qualified Opportunity Zone ("QOZ") and EquiAlt Secured Income Portfolio REIT ("REIT").  These Funds ("New Funds") began in 2018 and had slightly different structures but touted the same general investment program.  They were formed with funds derived from the Receivership Funds and were operated by employees of EquiAlt.  The REIT was initially and substantially funded by moving investors from the other three Receivership Funds into the REIT in a manner that defrauded the other investors in those funds. Significant misrepresentations were also prevalent in the raising of money for these funds.

These investments were sold without registration with either state or federal regulatory agencies. The offerings were purportedly made pursuant to federal exemptions from registration under the provisions of the Securities Act of 1933 provided in Regulation D. However, none of the first four Receivership Funds qualified for a Regulation D exemption or any other exemption from registration.  The offerings appear to be one continuous fraudulent offering of unregistered securities.  The lack of any exemption was clear to the perpetrators from the language contained in offering documents delivered to investors.

The investments were typically sold through unlicensed agents and financial advisors. This sales force was amassed in large part through Rybicki's efforts. Even though Rybicki was advised on more than one occasion that this method of distribution was illegal, EquiAlt and the Receivership Funds persisted up to the time this case was filed in using this illegal method of solicitation which resulted is an overall offering of almost $180 million dollars of securities to public investors.

This scheme was carried out through a myriad of corporate entities, LLCs and partnerships that were used in part to divert investor funds to the principals of the scheme. Through these companies, Davison and Rybicki personally received tens of millions of dollars that were siphoned from investor funds. Throughout the operation of this scheme, its viability was absolutely dependent on future funds being raised from investors. Without these funds, the ventures would have quickly failed. The ventures were insolvent almost from their inception and were certainly so when the SEC brought its action in February 2020.

The scheme centered on selling purported income-producing investments, in large part to senior investors, with the promise that these were safe, secure, and income-producing investments. With the initial investors, the misrepresentations were serious and numerous. The private placement memoranda and sales materials give glowing pictures of Rybicki and Davison without disclosing their previous business failures and their personal bankruptcies. The materials present no financial information and do not accurately or fully describe the methods and fees that were used to bleed money from the Receivership Funds for the use by Rybicki and particularly Davison. The perpetrators of this scheme falsely claim that the investments are being sold pursuant to exemptions from the registration provisions of state and federal securities laws. Further, the materials fail to disclose that EquiAlt LLC, the Receivership Funds and the agents selling the investments were selling these investments in violation of state and federal securities laws relating to the registration of broker dealers. Indeed, they misrepresented to sales agents that it was permissible for them to sell these securities while not registered with state and federal regulatory authorities.

Other significant misrepresentations relate to the use of proceeds description in the Private Placement Memoranda.  These materials indicate that 90% of the investors' funds will be invested in real estate when this was never intended (as shown by the fact that 12% commissions were being paid on the sale of the investments) and indeed never happened. Over time, less than half of the money raised was actually invested in real estate.  Moreover, there was never any disclosure that the interest payments being made to investors (between 8-12%) were dependent on funds raised from future investors.  Never during the life of these Receivership Funds were revenues from the rental of real properties or other sources (other than investor funds) sufficient to meet the overwhelming debt service obligations that were being created by the debentures that were being sold. This was not disclosed to the investors at the time they invested nor at any time through the Receivership Funds' operations.

As the sale of the debentures continued, the significance of the misrepresentations to investors increased.  At no time during the sale of the first four funds did EquiAlt or any of the Receivership Funds disclose to investors or prospective investors the financial condition of the funds.  No investor was provided with financial statements and indeed the financial records of the Receivership Funds were at best confused and incomplete.  Providing financial statements would have disclosed that the insolvency of the ventures and would have disclosed the massive amounts of monies being diverted by Rybicki and Davison. It would also have disclosed the fact that the Receivership Funds were not profitable.  Financial statements would also have revealed that the continuation of the Receivership Funds, EquiAlt LLC and interest payments were dependent on continuous investments from new investors.  Despite the fact that some actual real estate operations were occurring, the scheme is a classic Ponzi scheme.

**B.**    <u>**Sales of Investments**</u>

As mentioned above, the sales of the debentures were handled primarily by and through Rybicki.  For this purpose, he created an entity, BR Support Services LLC.  This entity was used to distribute the compensation for the sales activities. It also received all of the investment documentation submitted by the sales agents.  When investor documentation and monies were received, Rybicki, or others working for him, would accept and execute the investment paperwork on behalf of the appropriate fund.  The investment documentation would then be forwarded to the Tampa office of EquiAlt.   This might include one or more investments.  After the funds were received, EquiAlt would send 12% of the invested amount to BR Support Services' account.   Rybicki, or those at his direction, would then distribute commission amounts to the sales agents (generally 6% of the invested amount) and BR Support Services (Rybicki) would retain the remaining funds. Below is a summary of the sales agents who received commission payments from BR Support Services.

| Sales Agent Name | Total Paid |
|---|---|
| | |
| Agents Insurance Sales / Barry Wilken | $    (240,159.33) |
| American Financial Security / Ron Stevenson / Barbara Stevenson | (1,712,750.95) |
| Barry Neal | (119,037.20) |
| Ben Mohr | (113,578.00) |
| Bobby Armijo / Joseph Financial Inc. | (1,100,042.65) |
| Dale Tenhulzen / Live Wealthy Institute | (1,484,531.29) |
| Elliot Financial Group / Todd Elliot | (805,662.68) |
| Family Tree Estate Planning / Jason Wooten | (3,749,783.61) |
| GIA, LLC / Edgar Lozano | (278,807.24) |
| Greg Talbot | (260,941.89) |
| J. Prickett Agency / Joe Prickett | (187,374.57) |
| James Gray / Seek Insurance Services | (405,286.75) |
| John Friedrichsen | (327,681.69) |
| Lifeline Innovations / John Marques | (822,318.06) |
| Patrick Runninger | (293,599.53) |
| Sterling Group | (478,562.12) |
| The Bertucci Group LLC / Leonardo LLC / Leonardo Bertucci | (139,950.00) |
| Tony Spooner / Rokay Unlimited, LLC | (622,169.05) |
| Wellington Financial, LLC / Jason Jodway | (48,000.00) |
| **TOTAL** | **$ (13,190,236.61)** |

Additional funds designated as marketing expenses were also distributed to BR Support Services.  In connection with the Receivership Funds, approximately $25 million was sent to BR Support Services. *See* Exhibit A (Schedule of BR Support Summary of Sources).

Rybicki and the operation in Arizona he managed were responsible for recruiting the financial advisor agents who dealt with the investors.  Almost without exception, these agents were not registered to sell securities. Rybicki and others devised a plan to tell these persons that because they were finders or consultants they did not have to be registered.  While this notion is notoriously inaccurate, on multiple occasions Rybicki and those who worked with him were advised of this fact and chose to ignore the warnings and to continue to willfully and intentionally violate the broker-dealer registration laws.  Rybicki used the monies he received

to live a lavish lifestyle, buying expensive real estate, exotic cars, supporting a soccer club and expensive jewelry.

In addition to Rybicki, there was at least one other sales agent, Andre Sears, who received funds directly from EquiAlt's Tampa offices.  Andre Sears received commission payments, either individually or through his company MASears, LLC, totaling at least $3.7 million. *See* Exhibit B (Schedules Showing Payments to Sears).

The debentures generally had a term of three or four years. Investors were encouraged to renew their investments. Sales agents who succeeded in convincing investors to renew their investments received additional commissions-- essentially for convincing victims to not withdraw their money from the fraudulent Receivership Funds. Renewals were important to the scheme as withdrawal of investor funds would have led to a collapse of the fund.

### C.   <u>Funds</u>

#### 1.   *EquiAlt Fund (Fund I)*

Fund I was created in 2011 and began to raise funds at that time.  Over the life of the fund and until it was frozen by the SEC's enforcement action the fund had raised at least $114.6 million.  At the time of the SEC's action, Fund I had an outstanding principal obligation to debenture investors of $30.1 million.  Assuming that these debentures are not paid out, the interest obligation on the Fund I debentures, for the 12 months after the SEC's action on February 14, 2020, is approximately $7.2 million. In addition, Fund I had accrued "Growth" interest on these investments in the amount of approximately $6.5 million, as of the date of the SEC's action.  It should be noted that this accrued interest is not recorded on the fund's books as a liability.

Over the course of its history, distributions of at least $28.3 million were made to investors.  In addition, $4.5 million in investments were transferred out of Fund I to the REIT, one of the New Funds created by EquiAlt.  Revenues from its rental and resort activities in 2019 were $3.6 million which resulted in a net loss of $11 million. During 2019, over $30.7 million of new investments were sold by this fund.

2.     *EquiAlt Fund II*

Fund II was formed in 2013 and the fund sold over $40 million of debentures.  During it operations, Fund II made distributions to investors of at least $7.4 million. In 2018 Redemptions were solicited by EquiAlt to provide funds for investors to invest in the REIT, one of the New Funds.   At least one investment in the amount of $200,000 was transferred to the REIT. At the time of the SEC's action, Fund II had an outstanding principal obligation to debenture investors of $9.5 million. Assuming that these debentures are not paid out, the interest obligation on the Fund II debentures, for the 12 months after the SEC's action on February 14, 2020, is approximately $3.2 million. In addition, Fund II had accrued "Growth" interest on these investments in the amount of approximately $795,356, as of the date of the SEC's action.  Again, this accrued interest is not recorded on the fund's books as a liability. The revenues received from rental activities were $1.2 million in 2019.  During 2019 Fund II sold over $9.8 million of new debentures to investors.

In addition to the residential real estate properties regularly owned by EquiAlt Funds, Davison chose to invest $1 million of Fund II monies into Alternative Capital, LLC.

3.     *EquiAlt Fund III*

Fund III was created in 2013 and operated until June of 2016 when it was closed.  Fund III raised over $2.5 million from public investors.  During its operations, the fund generated $347,796 in rent revenue, it paid $407,520 in interest to its investors.

The winding down of the Fund III began sometime in 2015 with the transfer of its real estate assets to Fund I and Fund II. In exchange for these real estate properties, during 2015, Funds I and II transferred $1.55 million and $1.08 million, respectively, to Fund III. In addition, Fund I assumed the $190,000 liability associated with debentures sold to two of Fund III's investors. A significant portion the funds received from Fund I and Fund II was utilized for the return of principal and interest in the amount of $2.1 million owed to the remaining Fund III investors.

### 4.    *EA SIP Fund*

In 2016 another fund, the EA SIP Fund was created by EquiAlt.  This fund is similar to the prior three and has the same investment goals and activities.  The fund was to invest in distressed real estate and provide and 8% return to investors.  Between April of 2016 and the SEC action the fund had raised at least $17.7 million. At the time of the SEC's action, EA SIP had an outstanding principal obligation to debenture investors of approximately $67,836. Assuming that these debentures are not paid out, the interest obligation on the debentures, for the 12 months after the SEC's action on February 14, 2020, is approximately $66,772.  For 2019, however, with this fund investors were given the opportunity of either receiving monthly interest or designating their investment "Growth". The growth selection indicated that the investor would not receive monthly interest, and the interest would be added to their account and accumulated there—no interest was paid on the accumulated amounts as the interest was

not compounded on any basis.  Investors received statements that indicated the purported net net asset value or NAV.  *See* Exhibit C.  These valuations were inaccurate and misleading and failed to inform the investors that their investments were in an insolvent entity.   Of the investments made in the fund, at least $1.1 million has been redeemed. The fund has paid out at least $336,000 in interest over its life, and it has accrued "Growth" interest on these investments in the amount of $2.7 million, as of the date of the SEC's action.  Again, this accrued interest is not recorded on the fund's books as a liability.

### 5. *New Funds*

In 2018, EquiAlt formed two New Funds, the Qualified Opportunity Zone ("QOZ") and the EquiAlt SIP REIT. The monies raised for these New Funds was done in the same manner as the previous funds.  Unlicensed sales agents were used, and they were paid substantial commissions to entice investors.  The documents used to sell the investments contained similar misrepresentations regarding the background of the principals and did not disclose the ongoing scheme nor any facts relating to the financial results of the prior Funds.

In connection with the REIT, efforts to gather investors were initially not successful, and the investment required a threshold amount of investment before the offering could be closed.  Davison and Rybicki then reached out to one of the unlicensed sales agents who successfully convinced 13 investors to redeem their investments from the Receivership Funds and "invest" in the REIT.  These investors' prior debentures were redeemed at face value and then the funds were used to acquire shares in the REIT.  As described below, these transactions served to defraud the existing creditors of the Receivership Funds whose debentures were redeemed to the detriment of those investors remaining in those Receivership Funds.

The transactions are also examples of the ongoing comingling of monies and assets between all of the Funds. In total, at least $5.9 was raised for the REIT, of which $4.8 million was through redemptions of debentures issued by the Receivership Funds.  The QOZ fund raised approximately $1.7 million, again through unlicensed agents.  Commissions of approximately $452,890 were paid in connection with the sale of REIT shares and approximately $203,000 were paid as commissions for securing investments in the QOZ.

Until the SEC action was filed, EquiAlt continued to raise funds from investors.  The raising of these funds was necessary to the continued operations of the scheme, as without these funds continued operation would not have been possible.  During 2019, a total of $46.7 million was raised from investors, while total revenues from operations were $4.9 million and expenses, including payment of interest on the debentures, totaled $21.4 million.[3]

### D.   Real Estate Operations

When the Receivership Funds began in 2011, the practice was to acquire real estate and hold it.  Indeed until 2018 almost no real estate was sold by any of the Receivership Funds.  Rather, properties were renovated, rented and held.  The primary source of revenue from operations was from rental income.  The other source of funds was from continued investments from public investors.

The Private Placement Memoranda for the Funds that are currently in the Receivership all indicate that 90% of investor funds would be invested in real estate.  This was not truly intended nor did it occur.  After Fund I began to raise money, the Fund began to purchase real

---

[3] These amounts do not include the New Funds.

estate in the Tampa Bay area.  The fund did not invest 90% of the investor proceeds in real estate assets as represented.  According to internal EquiAlt documents a far lesser sum was invested in real estate.  Records of Fund I demonstrate that at least $114.6 million was raised from investors.  The records also reveal that Fund I only purchased approximately $23.5 million of real estate assets. Fund II also failed to invest 90% of its funds in real estate investments.  Rather Fund II raised at least $40 million of debentures and only invested approximately $7.4 million in real estate assets. The EA SIP Fund raised at least $17.7 million of debentures and only invested approximately $6.7 million in real estate assets.

At of the end of 2019, the "market value" of the real estate in Fund I was $48,539,000, Fund II was $16,187,000, and EA SIP Fund was $13,545,000, for a total of $78,271,000.  These figures come from internal documents of EquiAlt and were based on available valuation sources such as Zillow and MLS. The records also indicate valuations for proposed investment sales and while these values are significantly higher in the aggregate, the highest valuations indicate that the amount due on the notes owed to investors[4] exceeds these real estate holdings by more than $15 million.

E.     **Interest Obligations to Investors**

One of the most dramatic demonstrations of the insolvency of the Receivership Funds is seen in the outstanding interest obligations on the debentures.  At the time the SEC action

---

[4] The Receiver filed a motion for leave to retain a firm to perform valuations services to assist in the receivership operations. (Doc. 61).  Davison's counsel would not consent to the hiring of these professionals (Coldwell Banker) and due to the Court's stay order, this valuation has not been possible and the motion could not be heard. This lack of cooperation has impeded the Receiver's activities in this regard.

was filed, there was a total of more than $168 million of debentures were outstanding. This huge debt obligation generated interest obligations of over 8.6%. The interest owed from the SEC's action through the remainder of 2020 ranges from $844,262 to $909,829 per month. Additionally, for those investors who chose "Growth", there was an additional obligation of $350,270 accruing monthly. Absent new monies being invested into the Receivership Funds, the revenues to meet these obligations was no more than $4.9 million. The Schedule attached as Exhibit D (Schedule of Cash Flows) demonstrates the enormity of this problem. The debentures were for periods of 3 or 4 years and the principal was payable upon the expiration of that period. At the time of the SEC Action over $39 million of principal payments were overdue and the debentures were in default. By the end of 2020, that number increases to $59.2 million. Assuming the overdue debentures are not paid, during this period an additional $8.7 million in interest will accumulate adding to the obligations that EquiAlt cannot pay.

F.     **Creation of the QOZ and the REIT**

Based on the review and analysis of accounting records, bank records, as well as various investor forms retrieved from EquiAlt's Tampa offices, at least 13 investors with investments totaling $4.8 million were moved from other funds into the newly created REIT Fund as follows:

a.  12 Fund I investors with investments totaling $4,505,703 were moved from Fund I to the REIT;

b.   In addition, one of these Fund I investors, referenced above, was also an investor in Fund II and his investment and funds from Fund II, in the amount of $200,000, were transferred to the REIT;

    c. An EA SIP Fund investor with investments totaling $108,555 was transferred to the REIT; and

    d. The corresponding funds were transferred to the REIT's bank account.

It is important to note that the movement of investors from one fund to another has a detrimental effect on the investors in the original fund. For example, an investor that invested $100,000 in Fund I who later is moved to the REIT receives 100 cents on the dollar on his/her investment. Because the fund was insolvent that investor has received preferential treatment over all of the other investors in that fund and the fund itself has been harmed now having $100,000 less in cash. Thus by moving investors from Fund I to the REIT and redeeming the face value of the investors debenture Davison and Rybicki caused harm to the fund and its investors. Moreover, the investor that was moved to the REIT recovered 100% of his/her principal and may likely have also received interest payments while in Fund I. Any interest payments are subject to claw-back. Lastly, the investor that moved to the REIT is now an equity holder rather than the holder of a debenture so that investor may ultimately lose a portion if not all of his/her investment in the REIT.

In addition to the funds transferred to the REIT due to the movement of investors, EquiAlt and the Receivership Funds made payments either directly to the REIT or to third parties for the benefit of the REIT. *See* Exhibit E (Analysis of Transfer/Payments to/or for the Benefit of EquiAlt Secured Income Portfolio REIT). This schedule reflects that the Receivership Funds made payments totaling $557,604 on behalf of the REIT for professional services, including legal and accounting fees. In addition, the EquiAlt staff provided services to the REIT without receiving compensation.

Similar to the tables presented above, the following tables show the inflows and outflows from/to the New Funds, from inception of the fund through the date of the SEC's action, presented from the perspective of each entity reflected on the header.

**Movement of Receivership Funds to New Funds**

| Equialt Secured Income Portfolio REIT, Inc. | | | | |
|---|---|---|---|---|
| **Funds Received From:** | **Total** | **Funds Transferred To:** | | **Total** |
| | | | | |
| Equialt Fund LLC | $ 4,506,532.11 | | | |
| Equialt Fund II LLC | 200,000.00 | | | |
| EA SIP LLC | 108,555.22 | | | |
| Equialt LLC | 29,060.50 | | | |
| Equialt Qualified Opportunity Zone Fund LP | 15,000.00 | | | |
| **TOTAL** | **$ 4,859,147.83** | **TOTAL** | | **$ -** |

| Equialt Qualified Opportunity Zone Fund LP | | | | |
|---|---|---|---|---|
| **Funds Received From:** | **Total** | **Funds Transferred To:** | | **Total** |
| | | | | |
| | | Equialt LLC | $ | (111,544.69) |
| | | Equialt Secured Income Portfolio REIT, Inc. | | (15,000.00) |
| | | Equialt Fund LLC | | (888.00) |
| **TOTAL** | **$ -** | **TOTAL** | **$** | **(127,432.69)** |

The cash flow analysis for the REIT and QOZ are reflected on Exhibits F and G. (EquiAlt Secured Income Portfolio REIT – Cash Flow and EquiAlt Qualified Opportunity Zone – Cash Flow, respectively).

**G.    Comingling of Monies between EquiAlt LLC and the Various EquiAlt Funds**

The books and records of the Receivership Funds and New Funds clearly demonstrate the commingling of assets among the funds.  The following sections of this Report provide summaries regarding the commingling of these assets.

***1.   Transfers between Accounts***

The following tables summarize the transfers and comingling of monies between EquiAlt LLC, the Receivership Funds and the New Funds. Each table shows the inflows and

outflows from/to the other EquiAlt Funds, from inception of the fund through the date of the SEC's action, presented from the perspective of each entity reflected on the header.

| Equialt LLC | | | | |
|---|---|---|---|---|
| **Funds Received From:** | **Total** | **Funds Transferred To:** | | **Total** |
| Equialt Fund LLC | $  21,334,523.64 | Equialt Fund LLC | $ | (790,378.73) |
| Equialt Fund II LLC | 8,240,676.03 | Equialt Secured Income Portfolio REIT, Inc. | | (29,060.50) |
| EA SIP LLC | 3,873,172.72 | Equialt Fund III LLC | | (20,000.00) |
| Equialt Fund III LLC | 736,137.01 | | | |
| Equialt Qualified Opportunity Zone Fund LP | 111,544.69 | | | |
| **TOTAL** | **$  34,296,054.09** | **TOTAL** | **$** | **(839,439.23)** |

| Equialt Fund LLC | | | | |
|---|---|---|---|---|
| **Funds Received From:** | **Total** | **Funds Transferred To:** | | **Total** |
| Equialt Fund II LLC | $   3,576,738.73 | Equialt LLC | $ | (21,334,523.64) |
| Equialt LLC | 790,378.73 | Equialt Secured Income Portfolio REIT, Inc. | | (4,506,532.11) |
| Equialt Fund III LLC | 445,189.81 | Equialt Fund III LLC | | (1,550,808.59) |
| EA SIP LLC | 2,371.08 | EA SIP LLC | | (371,119.53) |
| Equialt Qualified Opportunity Zone Fund LP | 888.00 | Equialt Fund II LLC | | (38,128.00) |
| **TOTAL** | **$   4,815,566.35** | **TOTAL** | **$** | **(27,801,111.87)** |

| Equialt Fund II LLC | | | | |
|---|---|---|---|---|
| **Funds Received From:** | **Total** | **Funds Transferred To:** | | **Total** |
| EA SIP LLC | $    880,000.00 | Equialt LLC | $ | (8,240,676.03) |
| Equialt Fund LLC | 38,128.00 | Equialt Fund LLC | | (3,576,738.73) |
| Equialt Fund III LLC | 7,063.54 | Equialt Fund III LLC | | (1,089,431.39) |
| | | EA SIP LLC | | (800,503.00) |
| | | Equialt Secured Income Portfolio REIT, Inc. | | (200,000.00) |
| **TOTAL** | **$    925,191.54** | **TOTAL** | **$** | **(13,907,349.15)** |

| Equialt Fund III LLC | | | | |
|---|---|---|---|---|
| **Funds Received From:** | **Total** | **Funds Transferred To:** | | **Total** |
| Equialt Fund LLC | $   1,550,808.59 | Equialt LLC | $ | (736,137.01) |
| Equialt Fund II LLC | 1,089,431.39 | Equialt Fund LLC | | (445,189.81) |
| Equialt LLC | 20,000.00 | Equialt Fund II LLC | | (7,063.54) |
| **TOTAL** | **$   2,660,239.98** | **TOTAL** | **$** | **(1,188,390.36)** |

| EA SIP LLC | | | | |
|---|---|---|---|---|
| **Funds Received From:** | | **Total** | **Funds Transferred To:** | **Total** |
| Equialt Fund II LLC | $ | 800,503.00 | Equialt LLC | $ (3,873,172.72) |
| Equialt Fund LLC | | 371,119.53 | Equialt Fund II LLC | (880,000.00) |
| | | | Equialt Secured Income Portfolio REIT, Inc. | (108,555.22) |
| | | | Equialt Fund LLC | (2,371.08) |
| **TOTAL** | $ | **1,171,622.53** | **TOTAL** | $ **(4,864,099.02)** |

### 2. *Transfer of Properties Between Receivership Funds*

The comingling is also evident in the way the Receivership Funds transferred properties to each other as reflected on Exhibits H and I (Schedule of Movement of Properties between Funds and Diagram of Movement of Properties between Funds). This is yet another example of the fluid way these entities were treated by Davison and Rybicki.

### 3. *Fees Paid to EquiAlt by the Receivership Funds*

The Receivership Funds paid a variety of fees to EquiAlt, LLC.  *See* Exhibit J (Analysis of Fees Charged by EquiAlt LLC to EquiAlt Funds). This exhibit reflects the amounts paid by each fund by year. Below is a summary diagram showing the total funds that flowed from the Receivership Funds to EquiAlt LLC, cast as various fees:

Fees Charged By Equialt, LLC During 2012 - 2019



EquiAlt's books and records included a document titled "EquiAlt LLC Asset Management Fee Ratio through 10.31.19" that purports to reflect management fees paid by the Receivership Funds. *See* Exhibit K (excerpted below).

| Equialt LLC Asset Management Fee Ratio through 10.31.19 | | | |
| --- | --- | --- | --- |
| | Equialt Fund I | Equialt Fund II | EA SIP |
| Management Fees Paid | 4,210,000.00 | 1,825,000.00 | 300,000.00 |
| Acquisition_Disposition Fee Paid | 84,000.00 | | |
| Total Fees Paid | 4,294,000.00 | 1,825,000.00 | 300,000.00 |
| Cost of Assets Under Management | 35,327,889.19 | 9,748,632.08 | 9,625,787.63 |
| Asset Management Fee % | 12.2% | 18.7% | 3.1% |
| | | | |
| Total Fees Paid | 4,294,000.00 | 1,825,000.00 | 300,000.00 |
| Capital Raised | 104,408,632.04 | 36,603,265.48 | 16,197,957.35 |
| | 4.1% | 5.0% | 1.9% |
| | | | |
| Capital Raised | 104,408,632.04 | 36,603,265.48 | 16,197,957.35 |
| Rent | 2,022,099.00 | 897,000.00 | 32,000.00 |
| Resort Rent | 926,456.00 | | |
| Purchased Property $ | 2,506,176.00 | 2,362,500.00 | |
| Sold Property $ | 1,160,000.00 | 421,334.00 | |
| $ amount of Rehab | 2,405,000.00 | 327,500.00 | 3,145,000.00 |
| | | | |
| Asset Management Fee 3.5%    : - 5 % | 3,654,302.12 | 1,281,114.29 | 566,928.51 |
| Property Management Fee -10% 5 -12 | 202,209.90 | 89,700.00 | 3,200.00 |
| Resort Management Fee- 15%   : - % | 138,968.40 | - | - |
| Acquisition Fee- 3%    : - 4 | 75,185.28 | 70,875.00 | - |
| Disposition Fee- 3%    1 - 4 | 34,800.00 | 12,640.02 | - |
| Project Management - 12%   12 - 15 | 288,600.00 | 39,300.00 | 377,400.00 |
| | | | |
| Total Fees | 4,394,065.70 | 1,493,629.31 | 947,528.51 |
| Actual Paid | 4,294,000.00 | 1,825,000.00 | 300,000.00 |
| | | | |
| Difference | 100,065.70 | (331,370.69) | 647,528.51 |
| | 5,052,012. | 1,223,304 | 1,244,540 |

This document reflects the payment of management fees from EA SIP to EquiAlt LLC in the amount of $300,000.  However, this is another clear example of commingling in which EA SIP Fund makes two transfers to EquiAlt LLC purportedly for management fees, each for $150,000, on January 7, 2019 and March 22, 2019. However, EquiAlt LLC's accounting records label the first transfer of $150,000 as a loan from EA SIP rather than management fees. The second transfer of $150,000 is reflected on EquiAlt LLC's accounting records as management fees received from EquiAlt Fund II, LLC.

### H.    The Receivership Funds and EquiAlt are Insolvent.

As of December 31, 2019, the total assets of the three existing Receivership Funds did not exceed $105.8 million.  At the same time, these three funds had total obligations from the debentures sold to investors of $174 million. There does not appear to be any possibility that these obligations can be met. The financial records of the Receivership Funds maintained by EquiAlt amply demonstrate this fact. *See* Exhibit D (EquiAlt Fund Cash Flow, EquiAlt Fund II Cash Flow and EA SIP Fund Cash Flow) Below is further information regarding the financial health or lack thereof of the Receivership Funds:

1.    *Fund I*

- Since its formation through December 31, 2019, Fund I generated $12.3 million of revenue; over that same time it accumulated $32.4 million in net losses.

- During 2019, this fund paid out at least $5.1 million in commissions to sales agents related to these investments.

- According to the books and records of the Receivership Funds, as of December 31, 2019, Fund I recorded $67.1 million in assets (of which $5.2 million were receivables from related entities and $23.2 million of capitalized debt issuance costs which related to commissions paid to agents and capitalized interest paid to investors) and $111.8 million of liabilities.

2.    *Fund II*

- Fund II generated $3.6 million of revenue since its formation through December 31, 2019; over that same time period, Fund II accumulated a $16 million net loss.

27

- During 2019, this fund paid out at least $1.6 million in commissions to sales agents related to these investments.

- According to the books and records of the Receivership Funds, as of December 31, 2019 Fund II recorded $23.4 million in assets (of which $5 million were receivables from related entities and $5.8 million of capitalized debt issuance costs which related to commissions paid to agents and capitalized interest paid to investors) and $42.5 million in liabilities.

    3.    *EA SIP*

- EA SIP Fund generated $194,000 of revenue since its formation through December 31, 2019; over that same time period EA SIP Fund accumulated $4.4 million in net losses.

- During 2019, this fund paid out at least $725,470 in commissions to sales agents related to these investments.

- According to the books and records of the Receivership Funds, as of December 31, 2019 EA SIP Fund recorded $15.3 million in assets (of which $2.8 million were receivables from related entities and $1.5 million of capitalized debt issuance costs which primarily related to commissions paid to agents and capitalized interest paid to investors) and $19.7 million in liabilities.

- As previously stated the accrued interest on the "Growth" funds was not recorded on the fund's books as a liability.

In summary, all of the Receivership Funds were insolvent on or before December 31, 2016.  *See* Exhibits L, M and N (Balance Sheets of Fund I, Fund II, EA SIP, respectively, for the years 2016 through 2019)

**I.    Use of Receivership Funds and Assets by Rybicki and Davison**

Throughout the course of the EquiAlt scheme, both Rybicki and Davison have made dramatic use of investor funds and assets acquired with investor funds.  It is important to note both Rybicki and Davison were bankrupt shortly before the founding of EquiAlt.  Davison testified that he had few assets.  A review of the records of EquiAlt and the Receivership Funds and the bank accounts of both Rybicki and Davison reveals no source of funds for either of them other than directly and indirectly from investor funds.

**1.    *Barry Rybicki***

Barry Rybicki's most significant role in the scheme was directing the distribution of the debenture investments.  He gathered more than a dozen unlicensed salesmen who were responsible for raising the lion's share of the invested funds.  Routinely, as mentioned above, when an investment was made, BR Support Services, a company owned by Rybicki, received 12% of the invested amount.  The aggregate of these illegal payments totaled over $25 million. *See* Exhibit A.  A portion of these funds were paid to the unlicensed agents and the rest was used as Rybicki determined.  *See* Exhibit O (BR Support Summary of Uses).  Additionally, Rybicki received several million dollars of "distributions". *See* Exhibit P (Payments to Rybicki classified as Distributions).  As a result of receiving these millions of dollars, Rybicki was able to live a lavish lifestyle, driving a custom built Land Rover, a Porsche and a Ferrari.  He acquired numerous real properties and lived in an expansive million dollar Phoenix home. ***See***

Exhibit Q (Rybicki Real Estate). Other examples of this extravagance with investors' money included the purchase of hundreds of thousands of dollars of jewelry, luxury travel, sports tickets and memorabilia, and an investment or contribution of $22,000 to a semi pro soccer team in Phoenix. His son was the team's goalie. Additionally, BR Support Services funded travel for the team.

### 2.   *Brian Davison*

While Rybicki's use of investor funds is dramatic, it is dwarfed in comparison to the amount of funds used by Davison.  Davison had direct and complete control of EquiAlt and the Receivership Funds and he used those funds directly and indirectly in an extravagant manner for his and his family's own personal use.  Review of the records of EquiAlt and the funds reveals that Davison received over $32 million of investor funds or monies derived therefrom.  The Schedules attached as Exhibits R and S detail the funds taken by Davison for his personal use. (Payments to Brian D. Davison and Related Parties). Examples of his use of the proceeds of the investments follow:

- In May 2012, Davison's grandfather James Gordon McDonald died in Spokane, Washington. His estate was passed through the James Gordon McDonald Revocable Trust ("McDonald Trust").  Upon Mr. McDonald's death, Davison became the trustee of this trust and had total control of all of its transactions.  The beneficiaries of the trust were Davison and his wife Nicole and a niece of Mr. McDonald.  Pursuant to the trust, the niece received the proceeds of a brokerage account and Davison received the rest of the assets of the trust.  Mr. McDonald was a retired diesel mechanic and lived in a modest home in Spokane, valued at less than $200,000.  Once in control of the trust,

Davison used it as a vehicle to disguise his diversion of approximately $5 million dollars of investor funds for his personal use.  These diversions were often recorded in EquiAlt's financial records as repayment of principal or repayment of loans.  No such loans existed.  Rather, these funds were used by Davison to acquire his personal multimillion-dollar residence, exotic cars, and hundreds of thousands of dollars of jewelry. *See* Exhibit T (Sources and Uses McDonald Revocable Living Trust).

- In February and March of 2013, Davison used $399,517.66 from Fund I to purchase his personal residence at 128 Biscayne Avenue, Tampa.  Thereafter, he used $1,219,391.92 from EquiAlt LLC and EquiAlt Fund I for the renovation of the house.  During the course of these renovations, in September of 2017, Davison bought an adjoining lot (305 Bosphorous) for $913,412.51.  The funds for this purchase came from the McDonald Trust and as described above were investor funds diverted to the McDonald Trust.   The Biscayne property was initially purchased and titled in Fund I, later it was moved to a single purpose LLC, 128 Biscayne LLC.  The Bosphorous lot was titled in BNAZ LLC, another Davison shell company.  The properties were later titled in the name of Brian and Nicole Davison. The properties now show as a combined property on the property appraiser's website. The entire $2,532,322.09 spent on the acquisition and renovation of these properties came directly or indirectly from investor funds. *See* Exhibits U and V (Expenditures Related to 128 Biscayne Ave and 305 Bosphorous)

- In January of 2017, Davison purchased an apartment in the Flatiron District of New York City.  The apartment purchase was closed in February of 2017.  The total purchase

price was $2,747,984.73. The money used to buy the condominium came directly from Fund I.  The apartment has never been rented or listed for sale. It was only used by Davison and his family. After the purchase, Davison added $22,762.95 of amenities that were paid for by EquiAlt LLC.  *See* Exhibit W (Expenditures Related to 21 West 20th Street, No. 5, NY Property).

- As of May 2018, Davison's avarice was not satisfied.  Further examples of his personal acquisition of property using investor assets include the acquisition of a building at 2101W. Cypress Street in Tampa. This building was renovated in a luxurious fashion to be a cross between a man cave for Davison's personal use and a smaller version of Jay Leno's Garage.  The building housed some of Davison's Ferraris and other vehicles owned by friends and business associates.  It also included a small gym.  Davison purchased the building for $535,000 and added $265,681.80 of renovations. *See* Exhibit X (Expenditures Related to 2101 Cypress Street Property). All of the funds for this building and its renovation were taken directly from Fund I.

- At the time the Cypress Street property was secured by the Receiver, in addition to Ferraris and the automobiles of Davison's associates, the building also contained a 2018 Pagani Huayra.  The Pagani was purchased in April of 2019 for more than $3 million. Over $2,200,000 of the purchase price was wired from an EquiAlt Bank of America account and the remainder of the purchase price was paid through a financing lease of over $800,000f.  The funds from the purchase all came directly or indirectly from investor funds.  An email to the CFO of EquiAlt from Davison directs how the funds were to be accumulated to fund the wire for the purchase.  Monies came from

Fund I and the newly formed REIT and the $15,510.08 monthly payments on the financing lease were also paid from the EquiAlt Bank of America account and were booked as "Automobile Expense". *See* Exhibits Y and Z (Schedule of payments for Pagani and Davison's email directing how to amass purchase funds).

- On at least two occasions, Davison had EquiAlt purchase or put down a deposit for vehicles and then received a refund of those monies to him personally.

  - In December 2017, EquiAlt paid a $98,000 deposit by wire for a Land Rover for Davison through East Coast Defender ("ECD"). EquiAlt completed the transaction by check in May 2019 for $126,948.35. Ultimately, Davison decided to buy the vehicle through Zen Motorsports via a trade in of a Mercedes Benz G63. So ECD sold the vehicle to Zen. ECD then refunded the monies EquiAlt had paid, $224,948.35, to Davison personally.

  - In September 2018, EquiAlt wired $200,000 to Automobili Pininfarina GmbH for a deposit on a Battista. A year later Davison changed his mind and cancelled the purchase.  The refund of the $200,000 deposit was wired to Davison personally.

- Davison's extravagance was not limited to real estate and cars. A financial statement submitted by Davison to Merrill Lynch dated May 1, 2018 (Exhibit AA) details assets that he had acquired to that point in time.  In addition to his real estate holdings, the financial statement lists $8,177,000 worth of jewelry, three Ferraris, a Rolls Royce, four Mercedes and a $100,000 Land Rover among other vehicles.

- His jewelry holding increased even after the $8 million valuation in May 2018. Indeed, on January 17, 2020, within days of completing his testimony before the SEC, he completed the purchase of an Audemars Piguet 44mm Royal Oak Brande Complication Black Ceramic watch for $737,000. The invoice for this purchase is attached as Exhibit BB.   At the time of the asset freeze, he was in the process of selling $1,450,000 of watches through Sotheby's. A consignment agreement with Sotheby's for the sale of these watches is attached as Exhibit CC. Davison has yet to provide to the SEC the financial accounting required by this Court's Order.

## IV.   Opinions of the Receiver

Based on the findings outlined above, the Receiver has reached the following conclusions regarding EquiAlt, the Receivership Finds, and the QOZ and REIT:

- The Receivership Funds are the result of one continuous fraudulent scheme that utilized the same persons, methods and misrepresentations.

- The Receivership Funds are insolvent and without additional investor funds can barely support operations without paying interest to investors. If interest payments were made to investors the Receivership Funds would be out of cash in months.

- The Receivership Entities and business cannot lawfully be operated on an ongoing basis and if lawfully operated, the business presents no realistic opportunity for economic success.

- The Receivership should be expanded to include the New Funds (QOZ and REIT) for the protection of the investors in the Receivership Funds and the New Funds and to assure their continued ability to operate and be wound down. The

consolidation of New Funds with the Receivership Funds will also avoid preferences to some investors and harm to others due to the movement of movement on monies from one fund to another that occurred in 2018.

- The Receivership entities should be consolidated into one Receivership entity for the equitable distribution of assets and management of the Receivership Estate.

- As the Receivership Entities and the New Funds are not viable entities and absent continued illegal fund raising will fail rapidly,

  o The business of EquiAlt and all of the Funds should be wound down and their assets liquidated in a studied, thoughtful and orderly fashion.

  o The Receivership should seek to recover the assets and monies taken by the principals for inclusion in the Receivership Estate to be liquidated and distributed to victims and creditors of this scheme.

  o Attention should be given to the assertion of potential claims against professionals, financial institutions and others who facilitated, assisted, aided and abetted, participated in or profited from this scheme.

<u>**ACTIONS TAKEN BY THE RECEIVER**</u>

In the first 45 days, the Receiver has taken a number of steps to fulfill his mandates under the Order Appointing Receiver.

## V.    <u>Securing The Receivership Estate</u>

### A.    <u>Fund Accounting</u>

Attached as Exhibit DD is a cash accounting report showing the amount of money on hand from February 14, 2020, less operating expenses plus revenue, through March 30, 2020.

This cash accounting report does not reflect non-cash or cash-equivalent assets. Thus, the value of all property discussed below is not included in the accounting report. From February 14, 2020 through March 30, 2020, the Receiver collected $640,310.64 in business income and $267,550.06 from business asset liquidation, with $1,024,348.50 in business asset expenses. The ending fund balance is $4,269,480.39.

### B. Freezing Bank Accounts and Liquid Assets

After the Court entered the TRO and Order Appointing Receiver, the SEC worked to freeze bank accounts at Bank of America, Wells Fargo, Chase and Comerica. The Receiver and his professionals engaged in a preliminary review of documents and other information to identify other institutions that potentially held relevant financial accounts or lines of credit. On February 17, 2020, the Receiver and his professionals began serving the TRO and Order Appointing Receiver on financial institutions by email and facsimile. The Receiver's highest priority was to identify and freeze all accounts associated with the Receivership Entities.

Between the accounts frozen by the SEC and those identified and/or frozen by the Receiver, over $7 million was identified at various financial institutions. EquiAlt LLC and other Receivership Entities had separate bank accounts at Bank of America and Chase. The Receiver first attempted to gain signatory authority over those accounts. However, when it became clear that working through these banks was not expedient, the Receiver opened similar accounts at ServisFirst. The monies that had been frozen at Bank of America and Chase for those Receivership Entities. The Bank of America accounts were liquidated and provided to the Receiver for deposit in the mirrored accounts at ServisFirst on or about February 27, 2020 (Bank of America) and March 2, 2020 (Chase) for a total amount of $4,329,593.94.

The Receiver also opened a money market account for the Receivership at ServisFirst Bank (the **Receivership Account**).[5]  The Receiver has deposited $53,500 of clawback funds received from the Stovall House. Any recovered funds will be deposited to this account.  The Receiver will continue his efforts to identify any other accounts containing assets belonging to the Receivership Entities.

### 1.  *Accounts at Bank of America, N.A.*

The Receiver identified numerous accounts at Bank of America, N.A. ("**BOA**") associated with Defendants and relief Defendants containing a total of $5,258,589.80.

| Account No. | Account Title | Frozen Balance | Status |
|---|---|---|---|
| XXXXXXXX3190 | EquiAlt Fund, LLC | $793,500.20 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX3200 | EquiAlt Fund, LLC (Escrow) | $293,450.89 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX3284 | EquiAlt Fund II, LLC | $1,935,652.49 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX3297 | EquiAlt Fund II, LLC (Escrow) | $117,746.33 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX3213 | EA SIP, LLC | $762,902.13 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX5716 | EA SIP, LLC (Escrow) | $23,481.11 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX3310 | EquiAlt, LLC | $26,860.96 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX3323 | EquiAlt, LLC (Escrow) | $29,652.21 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX3187 | Blue Waters TI LLC | $47,950.35 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX3226 | TB Oldest House Est. 1842, LLC | $80,679.23 | Liquidated / Transferred to Receiver Controlled account |
| XXXXXXXX3336 | Silver Sands TI LLC | $38,049.45 | Liquidated / Transferred to Receiver Controlled account |

---

[5]  The Receiver also opened a checking/operating account for making disbursements.

| XXXXXXXX3307 | Bungalows TI LLC | $42,490.27 | Liquidated / Transferred to Receiver Controlled account |
|---|---|---|---|
| XXXXXXXX138 | McDonald Revocable Living Trust | $0 | Closed in 2019 |
| XXXXXXXX8041 | The Brian D. Davison Revocable Trust | $322,480.86[6] | Remains Frozen |
| XXXXXXXX4150 | EquiAlt Capital Advisors | $4,743.27 | Remains Frozen |
| XXXXXXXX4082 | EquiAlt Property Management LLC | $15,274.29 | Remains Frozen |
| XXXXXXXX4079 | EquiAlt Secured Income Portfolio REIT, Inc. | $310,341.81 | Remains Frozen |
| XXXXXXXX4008 | EquiAlt Secured Income Portfolio  Limited Partnership | $380.20 | Remains Frozen |
| XXXXXXXX6911 | EquiAlt Property Management, LLC | $30,043.99 | Remains Frozen |
| XXXXXXXX5648 | EquiAlt Secured Income Portfolio REIT Inc/EquiAlt Reit | $26,060.36 | Remains Frozen |
| XXXXXXXX8441 | EquiAlt Qualified Opportunity Zone Fund, LP | $356,089.00 | Remains Frozen |
| XXXXXXXX5126 | EquiAlt Property Management, LLC | $0.00 | Remains Frozen |
| XXXXXXXX 5113 | EquiAlt Property Management, LLC | $0.00 | Remains Frozen |
| XXXXXXXX4147 | EquiAlt Holdings LLC. | $380.20 | Remains Frozen |
| XXXXXXXX4011 | EquiAlt Secured Income Portfolio | $380.20 | Remains Frozen |

2. **Accounts at Wells Fargo Bank, N.A.**

The Receiver identified 12 accounts at Wells Fargo Bank, N.A. ("**Wells Fargo**") that were associated with the Defendants and Relief Defendants.   Defendants and Relief

---

[6] In September 2019, Davison closed the account for the McDonald Trust and transferred the funds to this account in the name of the Brian Davison Trust.

Defendants utilized these account prior to the accounts at Bank of America, N.A.  The accounts were closed in 2019 or earlier and contained no funds.

| Account No. | Account Title |
|---|---|
| XXXXXX 1045 | EquiAlt Fund, LLC |
| XXXXXX 5670 | EquiAlt Fund, LLC |
| XXXXXX 1052 | EquiAlt, LLC |
| XXXXXX 2771 | EquiAlt, LLC |
| XXXXXX 4073 | EquiAlt Fund II, LLC |
| XXXXXX 1717 | EquiAlt Fund II, LLC |
| XXXXXX 1444 | EquiAlt Fund III LLC |
| XXXXXX 0886 | EquiAlt Fund III LLC |
| XXXXXX 7000 | EA SIP, LLC |
| XXXXXX 1045 | EquiAlt Fund, LLC |
| XXXXXX 5670 | EquiAlt Fund, LLC |
| XXXXXX 1052 | EquiAlt, LLC |

### 3. *Accounts at JPMorgan Chase, N.A.*

The Receiver has identified 16 accounts at JPMorgan Chase, N.A. ("**Chase**") that are or were associated with the Defendants and Relief Defendants.

| Account No. | Account Title | Balance | Status |
|---|---|---|---|
| XXXXX8545 | Brian Davison | $46,888.98 | Unfrozen per Court Order 3/16/20 (living expenses) |
| XXXXX3995 | Brian Davison / Nicole Davison | $145.59 | $75,000 unfrozen per Court Order 3/16/20 (legal fees) |
| XXXXX2758 | Brian Davison | $114.23 | Frozen |
| XXXXX8993 | Barry Rybicki | $2,469.64 | Frozen |
| XXXXX5756 | Davison Capital LLC | $24,639.50 | Frozen |
| XXXXX5807 | Rosenbarry Holdings LLC | $220,021.06 | $85,000 unfrozen per Court Order; $23,400 unfrozen per 3/26/20 Order |
| XXXXX5358 | Rosenbarry Holdings LLC | $5,000.00 | Unfrozen per Court Order |
| XXXXX9319 | Brian Davison | $194.15 | Frozen |
| XXXXX0277 | 5123 E Broadway Ave LLC | $51,999.73 | Liquidated / Transferred to Receiver Controlled account |

| XXXXX96693 | 5123 E Broadway Ave LLC | $70,082.19 | Liquidated / Transferred to Receiver Controlled account |
| XXXXX9906 | BR Support Services LLC | $15,096.40 | Liquidated / Transferred to Receiver Controlled account |
| XXXXX2755 | Undetermined (possibly Rybicki-related) | $0.00 | Closed prior to Receiver's Appointment |
| XXXXX0318 | NV Support Services | $0.00 | Closed prior to Receiver's Appointment |
| XXXXX2361 | Barry Rybicki | $0.00 | Closed prior to Receiver's Appointment |
| XXXXX9610 | Barry Rybicki | $0.00 | Closed prior to Receiver's Appointment |
| XXXXX7513 | NV Support Services | $0.00 | Closed prior to Receiver's Appointment |

### 4.    *Accounts at Comerica Bank, N.A.*

The Receiver has identified 5 accounts at Comerica Bank, N.A. ("**Comerica**") that were associated with the Defendant, Barry Rybicki.

| Account No. | Account Title | Frozen Balance | Status |
|---|---|---|---|
| XXXXXX7306 | Barry M. Rybicki | $36,824.98 | Frozen |
| XXXXXX7314 | Barry M. Rybicki | $30,577.31 | Frozen |
| XXXXXX7261 | Rosenbarry Properties, LLC | $10,000.00 | Frozen |
| XXXXXX7721 | Rosenbarry Properties, LLC | $500.00 | Frozen |
| XXXXXX6792 | Undetermined (possibly Rybicki-related) | $36,824.98 | Frozen |

### 5.    *Investments and Investment Accounts*

The Receiver has identified and frozen at least 3 additional investment accounts associated with the individual defendants at Coinbase, E*Trade, and Merrill Lynch. These accounts total approximately $1,616,188.73.

Additionally, the Receiver identified and froze a $1,000,000 investment made by Mr. Davison through the EquiAlt Fund II in Alternative Capital LLC. The Receiver is continuing

to investigate this investment. To date, Alternative Capital LLC has provided only some of the documents requested by the Receiver.

### C.      <u>**Securing Real Property**</u>

The Receivership Estate contains hundreds of parcels of real property mostly in Hillsborough, Pinellas and Pasco counties, Florida, most of which are part of the ongoing real estate business of EquiAlt. The Receiver is continuing to oversee the renovations in progress of certain EquiAlt properties as well as reviewing potential sales of properties that were in process at the time the Receivership was created. However, of note, the Receivership Estate also includes the EquiAlt office at 2112 W. Kennedy Boulevard,  the New York City apartment, and the a vehicle warehouse/man cave. .In the Receivership Orders, the Court directed the Receiver to "take immediate possession of . . . all real property of the Corporate Defendants and Relief Defendants, wherever situated . . . ." (Doc. 11 ¶ 1).  The Receiver's actions in fulfillment of that directive are explained in the following subsections.

1.    *2112 W. Kennedy Boulevard, Tampa, FL*

On February 14th, after the Court entered the Order Appointing Receiver, the Receiver, accompanied by the U.S. Marshal's office, his lawyers, EHounds, and forensic accountants entered EquiAlt's office at 2112 W. Kennedy Boulevard. The team worked to secure the premises, access the computer networks, and interview employees who were on the premises. Locks were changed and security cameras were installed.

This property was originally purchased in the spring of 2018 for $975,000 with monies being paid by EquiAlt LLC, EquiAlt Fund II and McDonald Revocable Living Trust. Thereafter, EquiAlt LLC renovated the premises for almost $280,000.

2.    *21 W. 20th Street, Unit 5, New York, New York ("NY Condo")*

On the morning of February 25, 2020, a representative of the Receiver accessed the NY Condo.  The Receiver's representative secured the condominium and photographed its contents.

3.    *2101 W. Cypress Street, Tampa, Florida*

The Receiver accessed the Cypress warehouse on February 20, 2020. Stored in the warehouse were the following vehicles:

- 2018 Pagani Huayra;
- 2015 Ferrari 458 Speciale Coupe;
- 2018 Ferrari GTC4 Lusso;
- 1977 Ferrari 208 GTB; and
- 2012 Ford Fiesta.

Two additional automobiles were being stored in the warehouse that belonged to individuals unrelated to the Receivership. These individuals were later allowed to remove their vehicles from the warehouse.

In addition to the luxury automobiles, there were several high-end watches and dozens of empty watch boxes. The premises have been secured, locks changed and cameras installed to protect the assets and the real property at 2101 W. Cypress. The watches that were found at this location have been secured at a separate location.

### 4.   *Phoenix, Arizona operations*

As the Receiver was entering EquiAlt's office in Tampa on February 14th, his lawyers in Phoenix, Arizona, Baskin Richards, and a paralegal from Wiand Guerra King PA, accompanied by the US Marshal Service, presented themselves at Mr. Rybicki's home located at 3313 E. Daley Lane, Phoenix, Arizona ("Daley Lane").  Mr. Rybicki was served with the court documents and, after communicating with Mr. Rybicki's counsel, the US Marshal Service and the Receiver's representatives were invited into his home.   The Daley Lane home was also the office for Relief Defendant, BR Support Services, LLC., and several other  entities operated by Rybicki including Rosenbarry Properties, LLC.  Daley Lane was photographed and videotaped.   The Receiver's representatives interviewed Mr. Rybicki, obtained books and records from his home office and his computer was given to technology experts Digital Acuity. LLC, to be imaged.  Receiver's representatives also arranged for the cellular phones and computers of other BR Support Services, LLC employees to be delivered to Digital Acuity, LLC to be imaged.  After several hours the Receiver's representatives left the premises.   All documents retrieved from Mr. Rybicki's home were brought to the Receiver's offices.

The Receiver's representatives next travelled to executive office space leased by Mr. Rybicki/BR Support Services, LLC located at 11811 N. Tatum Blvd., Suite 3031, Office #30, Phoenix, Arizona 85028 ("Tatum Office).  They were accompanied by Mr. Rybicki who gave them access to the office and turned over the keys.   This was a small, one room virtual office space leased through Regus, which was identified by Mr. Rybicki as the sales office for the Receivership and New Funds.  The Tatum Office contained books and records of the Receivership Entities, including various sales and marketing materials related to the Funds, office furniture, computer equipment and personal items of the BR Support services, LLC's employees.  The Receiver's representatives inventoried the computer equipment located at the office.  The computers were taken to Digital Acuity, LLC to be imaged and subsequently returned to the Tatum Office or taken to the Baskin Richards offices.   The physical property (desks, chairs, etc.) were owned by Regus and were left at the premises.  The personal property of employees (including a computer monitor) was returned or left on the premises.   All documents retrieved from the Tatum Office were brought to the Receiver's offices.   The lease on the Tatum Office was set to expire in the next sixty days and the Receiver subsequently abandoned the premises.  Incoming calls to the Tatum Office were originally transferred to Rebecca Weibe, identified in documentation of the Funds as the Executive Administrative Coordinator for EquiAlt.   She was interviewed and also determined to be an employee of BR Support Services, LLC and the sister-in-law of Mr. Rybicki.   Incoming calls were subsequently forwarded to the EquiAlt offices in Tampa, Florida.  Some employees of BR Support Services, LLC were subsequently interviewed by the Receiver's representatives.

### D. <u>Investigation of Other Real Property</u>

The Receiver does not have authority over the individual defendants' assets but he has been tasked with investigating and tracing the use of investor proceeds for purposes other than legitimate business uses. To that end, the Receiver, with the help of Yip Associates, has been investigating the use of investor funds to purchase the personal residences of both Brian Davison and Barry Rybicki. As stated above, over $2.5 million as been expended by Receivership Entities to purchase and renovate Davison's personal residence. The Receiver is still in the nascent stage of the investigation into the funding of Mr. Rybicki's house. Thus far, the Receiver has identified payments of $450,000 made from Receivership Entity BR Support Services, which was controlled by Barry Rybicki, to Taylor Morrison for the lot for Mr. Rybicki's home.

### E. <u>Securing Personal Property</u>

#### 1. *Vehicles*

In addition to the vehicles located in the Cypress property, the Receiver has located and secured several other vehicles purchased by Mr. Davison. These vehicles include:

- 2020 Bentley GTC;
- 2009 Ferrari F430 Scuderia 16M;
- 2015 Ferrari F12 Berlinetta;
- 2019 Ferrari 488 Spider;
- 2016 Mazda MX5 Chassis #79; and
- 2012 SeaRay 300.

Additionally, Mr. Davison and his family, at the Court's request have been allowed to retain vehicles for personal use. Currently, those include the following:

- 2019 Toyota 4Runner;

- 1995 D110 ECD;
- 2020 Rolls Royce Cullinan; and
- 2015 Mercedes Benz ML350.

Mr. Rybicki owns the following vehicles of which he has possession for personal use:

- 2017 Ferrari 488 GTB
- 2019 Porsche 911
- Land Rover Defender

The Receiver is working with counsel for the individual defendants to sell some of these vehicles and will of course seek the Court's approval for any such sale.

### 2.   *Watches and Other Jewelry*

Mr. Davison is an avid collector of fine watches. As stated above, several watches were found at the Cypress warehouse and Kennedy office. Those items have been secured at a separate location. The Receiver has been working with several jewelers and auction houses to identify other watches/jewelry items and the source of funds used to purchase them. Pursuant to the Asset Freeze, Sotheby's is holding those items. The Receiver will continue to investigate these items. It appears that all of these items were acquired directly or indirectly with investor proceeds.  Upon confirmation of that fact, the Receiver will seek assistance of the Court for turnover of these assets if they are not voluntarily transferred to the Receiver.   When appropriate the Receiver will seek the Court's approval for the sale of such items.

### F.   Securing the Receivership Entities' Books and Records

The Receiver has taken extensive steps to secure the books and records of the Receivership Entities and to obtain documents from third parties.  First, the Receiver, through EHounds, obtained access to EquiAlt's cloud-based email network and preserved all records therein. Second, the Receiver obtained access to EquiAlt's Dropbox system which contains all

the records for the operations of the Receivership Entities. Third, EquiAlt maintained an investor portal website. Since the Receiver was appointed, counsel has been attempting to work through Linode to gain access to this portal.  Linode has refused to date to allow the Receiver total access to this website.

Finally, the Receiver has used the powers set forth in the Order Appointing Receiver to obtain numerous documents from at least 20 nonparties, including banks, accountants, lawyers, jewelers, auction houses, and car dealers.  The Receiver and his professionals are in the process of reviewing this information and will update the Court through future reports as his investigation progresses.

### G.     Operating Businesses

On February 14, 2020, the Receiver took possession of the offices of EquiAlt LLC at 2112 W. Kennedy Blvd. in Tampa, the main office of the real estate activities of EquiAlt, as well as the EquiAlt offices in Phoenix, Arizona. Rybicki and a number of people working for him conducted business from a suite office in Phoenix and also from his home. The activities of the Receivership Funds as well as the New Funds were conducted by employees of EquiAlt from the Tampa offices and the sales activities of the investments were directed by Mr. Rybicki and the personnel in Arizona from Phoenix.

At the time the offices were secured, EquiAlt had eleven employees working from the Tampa office as well as two other employees in the Tampa Bay area who conducted leasing and maintenance activities for the located at multi-unit properties. In addition, the company had two employees in Tennessee who oversaw properties that had been acquired there, both for the Receivership Funds and for the REIT.

On February 14th and in the few days that followed, the Receiver took possession not only of the premises of EquiAlt but also the records of EquiAlt in the various locations. The personnel at both of those locations were interviewed. The Receiver has reduced the staff in Tampa, and has also terminated all of the employees in Arizona. At the present time, the Receivership still retains the employees in Tennessee, but the continued retention of those employees is being evaluated.

From the Tampa office, the employees of EquiAlt oversee the rental real estate activities for the properties owned by the Receivership Funds. They continue to oversee certain development and construction projects that were begun prior to the Receiver being appointed. At the present time, EquiAlt has employees dedicated to leasing and tenant matters as well as maintenance issues related to the rental real estate properties. Two employees oversee the ongoing construction projects including rehabilitation and renovation projects that are necessary as rental properties turn over. EquiAlt's staff also includes three full-time employees who perform accounting activities, as well as employees who handle human resources matters for the company. The Receiver believes that the current staffing is adequate to support the real estate activities of the Receivership Entities.

With respect to the accounting of the ongoing business activities, the Receiver has enhanced the current staff through the addition of a temporary accounting person. The Receiver hired PDR-CPAs, as discussed elsewhere herein, to provide accounting services for the Receivership and the reporting activities that is required of the Receivership. In addition, PDR CPAs is overseeing the accounting activities at EquiAlt and giving the Receiver assistance and

guidance in determining and evaluating the sufficiency and quality of the ongoing accounting services.

The Receivership has maintained a robust accounting software that manages the rental real estate activities of the Receivership Funds. All of the bank accounts, as described elsewhere, have been centralized and the control of those bank accounts is directed by the accounting staff with the direct approval of the Receiver with respect to any expenditures. Moreover, these activities are reviewed, and reports of cash transactions are provided to the Receiver on a daily basis by the accounting staff, in conjunction with PDR-CPAs.

In connection with the ongoing projects that were underway or in the process of development at the time of the SEC action, the Receiver has, with the staff of EquiAlt, evaluated these projects and made determinations as to which projects will go forward and those which should be liquidated without further development. The Receiver has made these determinations by evaluating the progress of each project and its status, the amount of money necessary to reach completion, and the potential economic benefit to the Receivership. The Receiver has met with contractors who are performing construction and have advised them as to what projects are going forward and what construction projects or contracts the Receiver is rejecting. It is believed that these decisions will maximize the economic benefit for the Receivership estate while not incurring new expenses and risks. The Receiver will not attempt to pursue capital-intensive projects, in part, due to the fact that the Receivership does not possess substantial assets necessary to undertake new speculative development projects.

One sale transaction had been closed on February 14, prior to the Receiver's taking control of EquiAlt. The Receiver completed that transaction and has received proceeds of that

sale. There are several other projects or properties that were listed for sale at the time the Receiver was appointed. These potential sales have been evaluated and a number of them are being pursued by the Receiver. It is anticipated that in the near future the Receivership will enter into contracts for sale of some of the smaller properties. As required by federal statutes controlling the conduct of Receivers, these potential sales transactions will be presented to the Court for approval, prior to their completion.

At the present time, the Receivership estate is managing over 350 residential units. The residential activities have been impacted by the COVID 19 pandemic. Many tenants have requested accommodations with respect to the payment of rent and the Receiver has directed the leasing staff of EquiAlt to work with these tenants in order to avoid hardship. We are currently evaluating the impact upon the rental revenues to the Receivership Funds as a result of the pandemic. It is apparent that rental income revenues have slowed; however, the extent and impact of the pandemic on the rental revenues of the Receivership has yet to be determined.

Based upon current information, it is believed that the rental revenues from the rental properties will be sufficient to support the ongoing operations of the Receivership estate for the immediate future. The Receivership estate has sufficient funds to complete the projects with which the Receiver has determined to proceed. As the Receivership goes forward, one should anticipate a new phase of Receivership activities that will involve the orderly liquidation of the properties in the Receivership estate and the completion and liquidation of those projects that are currently underway.

Finally, after evaluating the cash flow and rent roles of the Receivership Funds properties, it is apparent that the Receivership estate cannot undertake the payment of the

interest due on the debentures that had been issued by the Receivership Funds, nor obviously, can the Receivership undertake to repay the over $30 million of debenture principal that is now due and owing.

The Receiver had hoped to be able to provide some forecast with respect to the potential liquidation of the real estate properties; however, due to the stay order entered by the Court and the refusal of Mr. Davison's counsel to agree to the Receiver's request to retain valuation consultant Coldwell Banker, information of that nature is not available to provide to the Court at this time. It should be anticipated that the Receivership estate will also, in the future, include very significant assets that will be recovered from those who have utilized investor funds to their benefit.

## VI.     **Retention of Professionals**

In the Court's initial Order Appointing Receiver on February 14, 2020, the Court specifically allowed the retention of the following legal, accounting, and other professionals: (1) Wiand Guerra King P.A. ("**WGK**"), a law firm; (2) Robert Stines of Freeborn (3) Yip Associates ("**Yip**"), a forensic accounting firm; (4) RWJ Group, LLC ("**RWJ**"), an asset management and investigations firm; and (5) E-Hounds, Inc. ("**E-Hounds**"), a technology and computer forensics firm.  *See* Doc. 11.  Briefly, WGK is a law firm with expertise in complex commercial litigation, securities litigation, regulatory proceedings, white-collar criminal litigation, and arbitration.   WGK's attorneys and paralegals will assist the Receiver's investigation and manage any contemplated litigation described below in Section VI.   Robert Stines at Freeborn is an attorney specializing in ediscovery and technology issues. He will assist the Receiver on technology and privilege issues.

Yip is a forensic accounting firm that specializes in insolvency and restructuring, Ponzi schemes, fraud investigations, insolvency taxation, business valuation, and litigation support. It will conduct a cash-in/cash-out reconstruction of Receivership bank accounts, which the Receiver needs, among other reasons, to pursue the contemplated litigation described in Section VI and to establish the claims process described in Section VII.

RWJ is an asset management and investigation firm, and its principal is Roger Jernigan. WGK retains Mr. Jernigan as an independent contractor to provide asset management and investigative services and, if necessary, to operate any viable business in the Receivership Estate. Mr. Jernigan's services have been and will continue to be necessary to secure, manage, and liquidate the assets described in this First Quarterly Status Report.

E-Hounds is a computer forensics firm that specializes in serving the legal industry. EquiAlt operated an investor portal and other public-facing websites. The Receiver has sought E-Hounds' assistance to analyze and manage these issues. The Receiver has also sought E-Hounds' assistance to image computers and other electronic devices and to retrieve documents relevant to the Receiver's investigation.

Additionally, the Receiver has retained PDR CPA to assist with fund accounting as well as the internal accounting for the ongoing businesses of the Receivership entities.

Finally, the Receiver has sought the Court's approval to retain Coldwell Banker to assist in the valuation of the properties held by the Receivership. Given the current stay and Mr. Davison's refusal to lift the stay to allow the Court to review this motion, this motion is in limbo.

### VII.    Pending and Contemplated Litigation

The Order Appointing Receiver requires this First Quarterly Status Report to contain "a description of liquidated and unliquidated claims held by the Receivership [E]state, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in (i) reducing the claims to judgment and (ii) collecting such judgments.)."  Doc. 11 ¶ 29.E.

### A.    Pending Litigation

In late February, the Receiver became aware of a matter pending in the Southern District of Florida, *Reddish v. Bungalows T I, LLC*, Case No. 19-CIV-62711-RAR, alleging violations of the Americans with Disabilities Act. The Receiver notified the Court of the SEC action and the stay on February 26, 2020. The Court stayed the action on February 28, 2020.

On _____, an EquiAlt investor class action was filed in the Middle District of Florida, Case No. 8:20-cv-00448-WFG-TGW. The complaint named several Receivership Entities including EquiAlt LLC and the Receivership Funds. The Receiver notified the Court of the stay that was imposed by this Court's Order. The Investor Plaintiffs later filed an Amended Class Action Complaint which dropped the EquiAlt entities as defendants. Although the Class Action Plaintiffs believe their amendment removes them from the stay, the Receiver is submitting a reply to the Court in that case setting forth reasons that the class action should be stayed.

### B.    Contemplated Litigation

The Receiver is reviewing information to determine if any individuals or entities have liability in connection with the activities underlying this case.   While the Receiver's investigation has only just begun, contemplated litigation can nevertheless be divided into two general categories.  First, the Receiver is working with forensic accountants to perform a cash-in/cash-out analysis of the Receivership Entities.  This will allow the Receiver to identify any investor who received more money from a Receivership Entity than he or she contributed to the Receivership Entity.  In Ponzi schemes, such amounts are generally referred to as "**false profits**" because the money transferred to the pertinent investor was not derived from legitimate activities but from other defrauded investors.  Receivers in the Eleventh Circuit (and nationwide) have a clear right to recover false profits through fraudulent transfer or "**clawback**" litigation.  *See, e.g., Wiand v. Lee, et al.*, 753 F.3d 1194 (11th Cir. 2014).

Second, the Receiver might also assert tort claims against brokers, accountants, sales agents, lawyers, and others who aided and abetted the scheme or otherwise knew or should have known of fraudulent activity.  The Receiver is not able to identify specific potential defendants at this time, but the Receiver will institute such actions (with Court approval) if appropriate and in the best interests of the Receivership.

VIII.  <u>**Claims Process.**</u>

The Receiver is building a list of investors and other creditors using information obtained at EquiAlt's office.[7]  On February 28,2020, the Receiver sent an email to hundreds

---

[7]  The Receiver is in the process of developing that list, but to protect the investors' privacy, the Receiver typically does not file investor information in the public docket.  Instead, the Receiver will maintain the list in his office and make it available to the Court, the SEC, and should the circumstances warrant, the defendants upon request.  When the Receiver moves the Court to establish a claims process, the Receiver will seek permission to file the list under seal.

of known, identifiable investors using information from EquiAlt, which informed the investors of the Receivership, the Receiver's website, and the opportunity for investors to register through the website.  *See* www.EquiAltreceivership.com/registration.   Because the Receiver already has significant cash in the Receivership Account, he anticipates moving the Court to establish a claims process at the earliest possible opportunity.

### IX.      The Next Ninety Days.

The Order Appointing Receiver requires this First Quarterly Status Report (and all subsequent reports) to contain "[t]he Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations." Doc. 11 ¶ 29.G. At this early stage, the Receiver recommends continuation of the Receivership because he still has (1) the ongoing need to manage and in part develop the real property business of the Receivership (2) to complete the investigation of the activities of the Receivership entities, its principals and others; (3) hundreds of properties to liquidate; (4) substantial personal property to liquidate, including luxury automobiles and watches; (5) potential litigation to bring, including contemplated clawback claims; and (6) a claims process to establish for the distribution of funds.

Additionally, the Receiver will be filing a motion to expand the Receivership to include the New Funds based on the information provided herein. There may be other entities as well that will be included in that motion. The Receiver will also move this Court to consolidate the Receivership Funds into one so as to simplify the winding down of operations and the claims process.

During the next 90 days, the Receiver will continue to collect and analyze documents from nonparties and other sources. The Receiver is also compiling and analyzing individual investments. This is a necessary task to assess and administer investor claims. The Receiver recognizes the importance of the return of funds to investors and will commence a claims process as soon as practicable. The Receiver will provide a more definitive time estimate as his analysis progresses.

The Receiver is also reviewing information to determine if any third parties have liability either to the Receivership Estate or investors. The Receiver will likely bring "clawback" and other actions in the future upon approval of the Court.

The Receiver will continue to attempt to locate additional funds and other assets and will likely institute proceedings to recover assets on behalf of the Receivership Entities. In an effort to more fully understand the conduct at issue and in an attempt to locate more assets, the Receiver will continue to conduct interviews and/or depositions of parties and third parties who might have knowledge of the fraudulent scheme.

## CONCLUSION

Investors and other creditors of the Receivership Entities are encouraged to periodically check the Receiver's website (www.EquiAltreceivership.com) for current information concerning this Receivership. The Receiver and his counsel have received an enormous amount of emails and telephone inquiries and have had to expend significant resources to address them. To minimize those expenses, investors and other creditors are strongly encouraged to consult the Receiver's website before contacting the Receiver or his counsel. However, the Receiver continues to encourage individuals or attorneys representing investors

who may have information that may be helpful in securing further assets for the Receivership

Estate or identifying other potential parties who may have liability to either the Receivership

Estate or investors to email (astephens@wiandlaw.com) or call Amanda Stephens at 813-347-

5100.

Dated this 8th day of May, 2020.

Respectfully submitted,

**s/Burton W. Wiand**
Burton W. Wiand, Receiver


**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on May 8, 2020 I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system.


**s/Katherine C. Donlon**
Katherine C. Donlon, FBN 0066941
Jared J. Perez, FBN 0085192
WIAND GUERRA KING P.A.
5505 West Gray Street
Tampa, FL  33609
T: (813) 347-5100
F: (813) 347-5198

*Attorney for Receiver, Burton W. Wiand*