UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

                                Case No. 8:20-CV-325-T-35AEP

BRIAN DAVISON;
BARRY M. RYBICKI;
EQUIALT LLC;
EQUIALT FUND, LLC;
EQUIALT FUND II, LLC;
EQUIALT FUND III, LLC;
EA SIP, LLC;

    Defendants, and

128 E. DAVIS BLVD, LLC, et al.,

    Relief Defendants.
_____/

**RECEIVER'S OPPOSITION TO DAVISON'S MOTION
TO ALTER OR AMEND FINAL JUDGMENT**

Receiver Burton W. Wiand hereby files this Opposition to Brian Davison's Motion to Alter or Amend the Final Judgment against him. (Dkt. 605) For the reasons set forth below, the Court should deny Davison's motion.

**Final Judgment Against Davison**

Based on the consent signed by Defendant Brian Davison ("Davison") and the Motion to Approve Consent Judgment submitted by the Securities and

Exchange Commission ("SEC"), this Court entered a Final Judgment against Davison on August 5, 2021. It is this judgment that Davison is seeking to alter or amend. Pursuant to that Final Judgment, Davison was found liable to the SEC for disgorgement of $24,600,000, prejudgment interest of $913,060, and a civil penalty of $1,500,000, for an agreed total of $27,013,060. The parties do not dispute this number.

    This however is only part of Davison's settlement required by the Final Judgment.  In addition, as part of an Assignment that was required by the Final Judgment, Davison was required to and agreed to turn over all his assets (except those specified in the Assignment) to the Receiver.  This part of the Assignment was required by the Receiver in consideration for his release of tens of millions of dollars of potential claims, such as malfeasance, fraud, and breach of duty, that would have been brought against Davison. The Receiver's claims against Davison far exceeded those of the SEC.  The law is clear that the Receiver had a right to seek imposition of a constructive trust over all of Davison's assets as they were all products of his fraudulent scheme. *See, e.g. In re Lee*, 574 B.R. 286, 293-294 (Bankr. M.D. 2017)( "A constructive trust is one raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it … *[E]quity will raise a constructive trust and compel restoration, where one through actual fraud, abuse of confidence*

*reposed or accepted,* or through other questionable means gains something for himself which in equity and good conscience he should not be permitted to hold.").

However, the question at the heart of this motion is how does Davison satisfy this judgment. The Judgment is very specific on this point and noticeably, the language is not cited once in Davison's motion. The Judgment provides that "any obligation of Davison to satisfy the disgorgement, prejudgment interest, and civil penalty payments, due to the Commission as set forth above**, shall be deemed satisfied by Davison if he, within 30 days of entry of this Final Judgment, disgorges the following assets to the Court-appointed Receiver** . . . ." Judgment at 6 (emphasis added). Davison and the Receiver agreed that the turnover would occur on August 31, 2021. Davison failed to disgorge all of the assets required at that time. The Receiver made immediate demand for those items that were missing. This demand has never been met.

The Judgment also required that Davison enter into an Assignment with Receiver which set forth the assets being turned over to the Receiver and the assets being retained by Davison. Other than the assets being retained by Davison, all assets were to be turned over to the Receiver. The list of specific assets included, but was not limited to, real property, watches, jewelry, automobiles, and business interests. This list of assets was heavily negotiated

3

between the SEC, Davison and the Receiver from late fall 2020 through the date the Assignment was signed in May 2021. Much of the discussion was related to valuation of the assets being turned over by Davison. Ultimately, the parties agreed to the list of assets referenced in the Judgment as well as stated in Exhibit A to the Assignment. Because there was no guarantee as to the value of the assets or when or how much the assets would sell for, the parties agreed that the judgment would be satisfied by the turnover of the assets. The Judgment states specifically that Davison "agrees that once he turns over the aforementioned property and assets, he relinquishes all legal and equitable right, title and interest in the property and assets ("Funds"), and no part of the Funds shall be returned to him." As mentioned above this was not the extent of Davison's obligations under the Assignment.  As part of the settlement, he agreed under oath that these were all of his assets and if other assets were discovered he must notify the Receiver and deliver those assets.

### Determination of Number of Coins to Turn Over

Davison was a collector of many expensive items – watches, automobiles, coins – most of them purchased with illegally obtained funds from the ponzi scheme that he operated through EquiAlt. One group of assets being turned over by Davison was coins. The Receiver and his team had gathered a limited amount of third-party documentation and documents obtained on the EquiAlt computers regarding the automobiles and watches. However, the Receiver had

almost no information regarding Mr. Davison's coins. Specifically, the Receiver was only aware of the coins in the Davison's safe deposit box which had been frozen at Bank of America and of several purchases made by Davison from IDC/KMA.

When attempting to memorialize the specific coins being turned over by Davison under the settlement, undersigned counsel relied heavily on Davison's representations regarding his coin collection. Davison had provided a chart of coins to the SEC during their negotiations.

| | | | | | |
|---|---|---|---|---|---|
| **Amer Eagle Gold** | 61 | | 109,800 | | |
| **Platinum Coins** | 24 =480 | | 432,000 | | |
| **Misc Collectables** | | 5,000 | 5,000 | | |
| **Safety Deposit Box** | | | 10,000 | | Pre 2011 - items, see list from inspection |

*See* Exhibit 1. This list did not match up to the Receiver's records. Emails from undersigned counsel to Davison's counsel on February 24, 2021 and again on March 16, 2021, asked for clarification as to the specific coins that Davison had in his possession. *See* Exhibits 1 and 2. In the information provided by Davison in these emails, he valued the coins at $432,000. 480 silver coins are not worth nearly that amount of money (less than $10,000). Finally, on April 23, 2021, Davison's counsel provided some clarity as to Davison's coins: "After discussing the matter with Mr. Davison, and ***having him examine what he had at home***, I think we can reach finality on the coins." *See* Exhibit 3 (emphasis

5

added). Regarding the gold American Eagles, counsel stated that "Mr. Davison currently has 61 Gold American Eagles at home." *Id.* As it relates to the platinum coins, counsel stated "As discussed, Mr. Davison never took delivery of an Isle of Man Nobles. However, he does have 480 Platinum American Eagles. It is possible that there may be some confusion between these coins, and that the Nobles were actually the platinum American Eagles." *Id.* Based on this information from Davison himself, these coins were included in the Assignment and proposed Final Judgment. The Assignment was signed by Mr. Davison three weeks after this email exchange. His representations were no mistake.

This was not as suggested by Davison's counsel a slight oversight made by Davison while he was preoccupied and distraught. He made these misrepresentations in the home stretch of these negotiations, a year after the case had been filed. The representation that he had 480 Platinum coins came from Davison and only Davison and was made repeatedly throughout negotiations that occurred over many months. The idea that a sophisticated collector of priceless valuables would not know the distinction between silver and platinum coins (almost $500,000) is beyond far-fetched. This is especially true given the intense dollar-driven negotiations that resulted in the Final Judgement and Assignment. The significance of his representations and the lack of his asserted carelessness is belied by the fact that he ultimately verified

these representations (on behalf of himself and his wife) **under oath** when he signed the Assignment.

After the Final Judgment was entered, Davison and the Receiver agreed to August 31st as the turnover date for the assets listed on the Assignment. As detailed in the Receiver's Motion for Order to Show Cause, during the turnover, Davison provided 58, not 61, American Eagle gold coins and 480 Silver American Eagles, not Platinum American Eagle coins. Now, almost a year later, Davison wants this Court to let him out of his sworn Assignment, specifically related to the items he counted and about which he provided the information. Davison seeks to amend or alter the judgment under Federal Rule of Civil Procedure 60(b)(1) or (b)(5) to "fix" this issue and provide him a pass. As discussed more fully below, the Court should not grant the relief sought by Davison on either count.

### **Rule 60(b)(5) – Satisfaction of Judgment**

Rule 60(b)(5), the Court may relieve a party from a final judgment if "the judgment has been satisfied, released, or discharged." Davison seeks to alter the judgment in this case because he believes that the judgment has been satisfied. However, as stated above, the Final Judgment states specifically, "any obligation of Davison to satisfy the disgorgement, prejudgment interest, and civil penalty payments, due to the Commission as set forth above**, shall be deemed satisfied by Davison if he, within 30 days of entry of this**

7

**Final Judgment, disgorges the following assets to the Court-appointed Receiver** . . . ." Judgment at 6 (emphasis added). Thus, the only way that Davison can satisfy the disgorgement, prejudgment interest, and civil penalty payments, is by turning over all the assets set forth in the Judgment and attendant Assignment. The cases cited by Davison relate to monetary judgments. That is not the case here. The fact that the Receiver has parlayed the assets that have been turned over into a benefit for the investors defrauded by Davison's scheme is irrelevant to Davison's arguments. As stated above, the Receiver, in consideration of Davison's Assignment, released claims far exceeding those of the SEC, and waiving his claim to a constructive trust over Davison's assets.

Davison cites to the *AIG Baker Serling Heights* case for the holding that not granting relief from the judgment would result in an inappropriate windfall to the plaintiffs in that case. 579 F.3d 1268, 1273 (11th Cir. 2009). However, this is not a windfall. When the SEC and Receiver agreed to accept the Assignment, which included the turnover of all assets not specifically excluded, as a settlement, it was a calculated risk to hopefully recover as much as possible for the defrauded investors. There was no guarantee to the Receiver

8

that the assets would result in any particular amount of recovery for the investors.[1]

This is evidenced by two aspects of the Judgment. First, satisfaction of the payments comes only from turnover of the assets listed. Davison argues that "any time a money judgment is paid, the judgment debtor is entitled to satisfaction of that judgment." Motion at 9. However, this was not a money judgment. Rather, the Judgment required Davison to turn over all assets not specifically excluded, which he has failed to complete. Second, under the Judgment, Davison agreed that "once he turns over the aforementioned property and assets, he relinquishes all legal and equitable right, title and interest in the property and assets ("Funds"), and no part of the Funds shall be returned to him." Judgment at 9. In other words, if the assets wind up being worth more than $27 million, Davison does not get assets returned to him nor does he get any benefit from that gain.. In a similar fashion, Davison does not get to mislead the Court, the SEC and the Receiver regarding his assets, in an amount just under half a million dollars, and later get a pass under the guise of Rule 60.

If anything, the prospective values of the assets listed in the Assignment were agreed to by Davison—a purported expert in real estate and collectable

---

[1] There is no possibility that the proceeds from these assets will remedy the full extent of the damage caused to over 1700 investors.

9

watches – during the months-long negotiations.  If the Receiver's skill, market conditions, or Davison's misjudgment resulted in the Receiver garnering better liquidation prices than Davison thought would occur, he does not now get to claim seller's remorse.  Nor does Davison get to avoid discussing the benefit and value he received from the Receiver granting him a release.

### Rule 60(b)(1) – Mistake

As alternative grounds, Davison wants this Court to believe that the differential in the coin turnover was a mistake. However, Davison's version of the facts do not comport with the reality of the situation. Specifically,

- Davison's motion states "after this case was filed, Davison turned over all of the gold coins he had and the boxed set of 480 coins." These coins were not turned over until August 31, 2021, a year and a half after the case was filed.

- "Davison believed that the 480 American Eagle Coins he had were platinum and that he had 61 gold American Eagle Coins." As noted in the April 23, 2021 email from Davison's counsel, Davison had counted the coins and made representations to the Receiver and the SEC about the coins in his possession. Remember, these coins were in Davison's possession. He was the only one with access to the coins, so all the parties involved were relying on his representations.

10

- "It was a shock to Davison when . . . his personal computer was taken from him." In fact, the Receiver provided Davison with a copy of the hard drive from his laptop. Davison cannot now complain that he did not have his laptop.

- "Davison attempted to create a complete list of all of his assets, even though he did not have access to any of the records kept in EquiAlt's offices." Davison had possession of the coins at issue. He did not need access to records to make his list of assets.

Davison finishes this argument claiming that "the Receiver will never be able to present any evidence that Davison ever had more than the 58 gold American Eagle coins and boxed set of 480 silver American Eagle coins" so it must be a mistake. In fact, on April 23, 2021, his counsel represented to the Receiver and the SEC that Mr. Davison, upon examination of the coins, had 61 gold coins at home and had 480 Platinum American Eagle coins. *See* Exhibit 3. Are we and the Court supposed to believe Mr. Davison's representations in April 2021 and his sworn affirmation in May 2021 or are we supposed to believe his representations now a year a half later?[2] He had no incentive to mispresent

---

[2] At the time of the turnover, when confronted, Davison tried to convince the Receiver and Mr. Lopez that the coins were platinum. To date he has failed to produce any documents that he ever purchased platinum coins or silver coins despite an outstanding subpoena to him on this issue. Additionally, the Receiver subpoenaed numerous coin outlets to try to track down any purchase by Davison. Not a single dealer had evidence that Davison had purchased platinum coins through them.

11

his coin collection in the spring of 2021, especially since he was the only one with access to it. However, in the summer of 2022, facing a contempt motion and the Receiver's demand for the $500,000 differential, Mr. Davison's motivations could be different.

## CONCLUSION

Based on the foregoing, the Receiver respectfully requests that the Court deny Davison's motion to alter or amend the judgment against him and enforce the provisions (or monetary equivalent) against him.

Respectfully submitted,

**s/Katherine C. Donlon**
Katherine C. Donlon, FBN 0066941
kdonlon@jclaw.com
**JOHNSON, CASSIDY, NEWLON & DECORT P.A.**
2802 N. Howard Avenue
Tampa, FL 33607
Tel: (813) 291-3300
Fax: (813) 324-4629

and

R. Max McKinley, FBN 119556
mmckinley@guerraking.com
**GUERRA KING P.A.**
1408 N. Westshore Blvd., Suite 1010
Tampa, FL 33607
Tel: (813) 347-5100
Fax: (813) 347-5198

*Attorneys for Receiver Burton W. Wiand*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 9, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

s/ Katherine C. Donlon